312

McCurrach Organization, Inc. *v.* United States

No. 6248.—Invoices dated Langley, Macclesfield, England, August 1942, etc.
 Certified September 1942, etc.
 Entered at New York, N. Y., January 15, 1943, etc.
 Entry No. 716768, etc.

(Decided January 21, 1946)

*Benjamin A. Levett* for the plaintiff.

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the defendant.

Tilson, Judge: The merchandise covered by appeal No. 151146–A invoiced as Hand Printed Silk Foulard, plain weave, Dye/3 cols. was entered at £0.6.7 per yard, less 1¼ per centum and less 2½ per centum, plus cases, marking and packing and was appraised at £0.8.5, less 3 per centum discount, plus case and packing; Hand Printed Silk Foulard, plain weave, Dye/Blo. 2 cols., entered at £0.7.1 per yard, less 1¼ per centum, less 2½ per centum plus cases, marking and packing and was appraised at £0.9.2, less 3 per centum discount, plus case and packing; and Hand Printed Wool Cashmere, Qual. 2059, plain weave, Dye/Blotch/2 cols., entered at £0.5.6, less 1¼ per centum, less 2½ per centum, plus cases, marking and packing, and was appraised at £0.6.11, less 3¼ per centum discount, plus case and packing. The merchandise covered by the other two appeals was entered under duress in which the importer made additions to meet the advances made by the appraiser in appeal No. 151146–A, and was appraised as entered.

The plaintiff contends for his entered values and the defendant insists that the appraised values are the correct dutiable values. The record shows that the appraisement was made on the basis of export value.

At the trial counsel for the plaintiff offered the testimony of one witness and certain documentary evidence, while counsel for the defendant offered the testimony of two witnesses and also certain documentary evidence.

Plaintiff's witness stated that the involved merchandise " * * * is silk woven foulard, woven in Japan and shipped to England * * * In the gray, in the raw condition, * * * imported from Japan by Aldwinckle & Company and, under their supervision, dyed and printed into necktie patterns, in which condition the goods are shipped to the United States."

The invoices covered by these appeals were consulated in September and October 1942, and entry of the merchandise was made on January 15, 1943, and March 30, 1943. Plaintiff's witness also

testified that "In July, 1941, it became prohibited in England by a war measure to buy any silk material at all. * * * For any purpose, export or import, and after that time the only material of this kind that remained for sale or export or any other purpose was that which happened to exist in a warehouse or somewhere, as in a man's own inventory. If he happened to possess it at that time he might happen to offer it, but if he didn't he couldn't get any. * * * it took a very short time to consume what little existed, and by October, 1942, no trace of it existed. Subsequent to the prohibition order in England have you had any offers?—A. I bought some. * * * Two or three weeks, I believe, after that freezing order, but none at all since then. They snapped them up."

R. X Q. Well, these additional purchases you made after the ones involved in these cases, were they at higher prices than the merchandise involved in this case?—A. If you will permit me a practical answer and not an exact one, they were within, probably within 3 pence, certainly within 6 pence, of the price I paid to Aldwinckle. If my recollection is correct, they were the same.

\* \* \* \* \* \* \*

R. X Q. I wanted to know whether the market was going up or down since—from 1939 to 1941. It was rising, wasn't it?—A. No; was rising slightly due to some little increases in labor cost until the silk freeze, and from the silk freeze you had an entirely unnatural market—no market; couldn't be replaced.

With reference to the general situation in the market after the freezing order on silk went into effect in England, defendant's witness testified:

X Q. And, when you bought this, did you know that this was the last that you could get of that kind and character?—A. Well, I knew it was pretty near the last. I wasn't sure it was the last.

X Q. You knew there was a dearth of this material in England at that time?—A. Yes, sir.

\* \* \* \* \* \* \*

X Q. Isn't it a fact that you knew this was about the last you could get, that you would be willing to pay practically any reasonable price to get it?—A. Well, I knew it was getting pretty near the end of the rope. I couldn't say surely. I knew it was the last I could get.

This witness also stated that he believed to be true the following statement contained in exhibit 2:

This in my opinion is not a regular trade price—it is disproportionate and inflated to the usual trade price and would not have been paid or even demanded had it not been for the fact that this class of business had ceased for the duration of the war so far as my company is concerned.

The foregoing is sufficient to show that after the so-called freezing order went into effect the offer, sale, and purchase of this class of merchandise in England was not normal and was not in the ordinary course of trade. It is true that one of defendant's witnesses testified that he purchased the merchandise covered by exhibit 3 in the ordi-

nary course of trade and that he would gladly have bought twice as much at the same price, but his statement that the merchandise covered by exhibit 3 was purchased by him in the ordinary course of trade, is not in accord with his statement that he knew it was getting pretty near the "end of the rope," and that he knew it was the last he could get. The knowledge of the witness that the merchandise covered by exhibit 3 was the last he could get perhaps accounts for his statement that he would gladly have bought twice as much at the same price.

In support of the values contended for by the defendant, certain invoices of other importers covering such or similar merchandise were admitted in evidence. While some of these invoices are now before this court in appeals for reappraisements, they involve only the question of whether or not an item of war risk insurance is a dutiable item, and as to some of these invoices no appeal for reappraisement was filed, the importer accepting the appraised values.

With reference to a similar situation in the case of *Hensel, Bruckmann & Lorbacher* v. *United States*, Reap. Dec. 5010, I observed:

* * * Even if the merchandise shown by these papers and that before the court were accepted as identical, there appears no reason why the importer herein should be bound by those values, when they were never questioned in court.

In affirming the above, the appellate division, in Reap. Dec. 5244, said:

With reference to said exhibit, which consists of photostatic copies of invoices made at various times covering silk, some of which is not identical with the silk in question, we are of the opinion that it can have little if any value as evidence of export value of the merchandise in the instant shipments. As we gather from the testimony, none of these cases was appealed to reappraisement. In the instant case the importer did appeal and has offered testimony that tends to overcome the action of the appraiser in determining values as appraised. It is entirely possible that similar evidence might have been adduced with reference to the merchandise on the invoices covered by said exhibit 6.

As to exhibit 3, now before me, an appeal to reappraisement has been filed, but in addition to the fact that it is still pending before the court, it does not raise the question of the *per se* value of the merchandise, but only the question of the War Risk Commodity Insurance. As to the merchandise covered by the other invoices, the importers apparently accepted the appraised values, as no appeal to reappraisement has been filed.

In support of the values contended for by him, counsel for the plaintiff offered in evidence an affidavit of Frank Leslie Freegard, marked "Exhibit 1," from which the following is quoted:

That I am familiar with such shipments and with the merchandise covered thereby, and that orders for the hand printed silk foulard were accepted by my Company on January 23. 1941 and September 19. 1941 at the respective prices noted on the respective invoices; that at no time were goods of this quality 18

momme sold or offered for sale in the Home Market; that the principal Market for such merchandise at the time such orders were taken and continuously up to the time the manufacture of such merchandise ceased was the United States of America and that the price stated on such invoices on the respective dates thereof was the freely offered price for such or similar merchandise when sold in the usual wholesale quantities and in the ordinary course of Trade for export to the United States and continued to be such freely offered price until the supply of such merchandise was exhausted with the exception of a sale of the remainder of the merchandise on hand made on February 4. 1942 which sale consisted of 1,000 yards of 18 momme sold to Messrs. Franc-Strohmenger & Cowan Inc., 10, East 40th Street, New York, United States of America, at the basic price of 6/- NETT for dye and one colour and 6/6 d NETT for dye and two colours, such advance being due to the increased cost of printing and this sale was the last sale made by my Company of such or similar merchandise.

After a careful examination and consideration of the entire record before me, and for the reasons hereinbefore stated, I find and hold the proper dutiable export value of the merchandise covered by appeal No. 151146–A to be the entered value, and the proper dutiable export value of the merchandise covered by appeals No. 152201–A and No. 152202–A, I find and hold to be the entered value less any additions made by the importer to meet advances made by the appraiser in appeal No. 151146–A. Judgment will be rendered accordingly.